UNITED STATES of America

v.

Bryan THORNTON, a/k/a "Moochie", Appellant (D.C. Criminal No. 91–00570–03).

UNITED STATES of America

v.

Aaron JONES, a/k/a "A", "J", Appellant (D.C. Criminal No. 91–00570–01).

UNITED STATES of America

v.

Bernard FIELDS, a/k/a "Quadir", "Q", Appellant (D.C. Criminal No. 91–00570–05).

Nos. 92–1635, 92–1785 and 92–1878.

United States Court of Appeals, Third Circuit.

Argued July 8, 1993.

Decided July 19, 1993.

---

**16.** Of course, the loss of consortium claim as related to Count III will be barred under the Tort Claims Act if Mrs. Abdallah's direct claim on the count is barred under that Act. We also reiterate that Mr. Abdallah has asserted his own claim for severe mental and emotional distress in Counts I and III, and that the Abdallahs have alleged that there was a direct physical injury inflicted on Mrs. Abdallah only in count I. Obviously Mr. Abdallah should not be permitted a double recovery, *i.e.*, a recovery for the same injury from severe mental and emotional distress directly and through a claim of loss of consortium.

Christopher· G. Furlong (argued), Springfield, PA, for appellant Bryan Thornton.

Gerald A. Stein (argued), Philadelphia, PA, for appellant Aaron Jones.

Robert J. Rebstock (argued), Louis T. Savino, Jr., Louis T. Savino & Associates, Philadelphia, PA, for appellant Bernard Fields.

Michael Baylson, U.S. Atty., Allison D. Burroughs, Joel M. Friedman, Abigail R. Simkus, Asst. U.S. Attys., Philadelphia, PA, Joseph C. Wyderko (argued), U.S. Dept. of Justice, Washington, DC, for appellee.

Before: SLOVITER, Chief Judge, NYGAARD and WEIS, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Chief Judge.

Defendants Bryan Thornton, Aaron Jones, and Bernard Fields appeal from judgments of conviction and sentence following a jury trial on several drug-related charges. Defendants make, in combination, six claims of error which they argue require a reversal of their convictions and a new trial. We review the evidence in the light most favorable to the verdict winner, in this case the government. *See United States v. Ofchinick,* 883 F.2d 1172, 1177 (3d Cir.1989), *cert. denied,* 493 U.S. 1034, 110 S.Ct. 753, 107 L.Ed.2d 769 (1990).

I.

On October 2, 1991 a grand jury in the United States District Court for the Eastern District of Pennsylvania returned a thirty-two count indictment charging Thornton, Jones, Fields, and twenty-three others with conspiracy to distribute cocaine, crack cocaine, and heroin between late 1985 and September 1991. The indictment alleged that all defendants were members of a criminal organization known as the Junior Black Mafia ("the JBM"), which sold and distributed for resale large amounts of cocaine and heroin in the Philadelphia area. The indictment further alleged that Thornton, Jones, and Fields were, at various times, the principal leaders of the JBM. The district court ordered the trial of these three defendants to be severed from the remaining defendants, and then denied motions by Thornton and Jones for separate trials.

At the fifteen-day jury trial that followed, the government introduced a substantial

amount of evidence in support of its charges against the three defendants, including the testimony of ten cooperating witnesses who were members of or who had had direct dealings with the JBM, more than sixty wiretapped or consensually recorded conversations concerning members of the JBM, and physical evidence, including documents, photographs, drugs, weapons, and drug-related paraphernalia. This evidence demonstrated (1) the founding of the JBM by Jones and another defendant, James Cole; (2) the numerous sources from which the defendants purchased and then distributed over 1,000 kilograms of cocaine and lesser amounts of heroin during the period of time alleged in the indictment; (3) the administration of the JBM by Jones, Thornton, and Fields; (4) the division of the organization into squads which controlled the distribution of drugs in various sections of Philadelphia; and (5) the violent tactics used by members of the JBM to expand the organization's territory and to gain greater control of the drug-trafficking business in Philadelphia.

The jury found the defendants guilty of conspiracy to distribute and to possess with intent to distribute cocaine and heroin in violation of 21 U.S.C. § 846 (1988) and possession with intent to distribute and distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1) (1988). In addition, Thornton and Jones were convicted of participating in a continuing criminal enterprise in violation of 21 U.S.C. § 848 (1988 & Supp. III 1991), and Fields was convicted of using a firearm during a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1) (1988 & Supp. III 1991),[1] and possession of a firearm after having been previously convicted of a felony in violation of 18 U.S.C. § 922(g)(1) (1988). All three defendants were sentenced under the United States Sentencing Guidelines to life imprisonment, and Thornton and Jones were each ordered to forfeit $6,230,000 to the government pursuant to 21 U.S.C. § 853 (1988). The defendants have not challenged the propriety of their sentences or fines. Nor, significantly, have they alleged that the evidence was insufficient to support the verdicts.

## II.

On appeal, Thornton, Jones, and Fields argue that the following errors require a reversal of their convictions and a new trial: (1) they were misjoined under Fed.R.Crim.P. 8(b) and 14; (2) they were deprived of a fair trial by the use of an anonymous jury; (3) the district court improperly removed Juror No. 3 and declined to remove Juror No. 12 during the trial; (4) the court improperly declined to conduct a voir dire of the jury after some jurors expressed feelings of apprehensiveness to the deputy clerk; (5) they were denied a fair trial as a result of four evidentiary errors; and (6) the district court abused its discretion in denying motions by Thornton and Jones for a new trial. We will address each of these allegations *seriatim.*

### A.

We review the joinder of two or more defendants under Fed.R.Crim.P. 8(b)[2] *de novo* and the denial of a motion for severance under Fed.R.Crim.P. 14[3] for abuse of discretion. *United States v. Eufrasio,* 935 F.2d 553, 568 (3d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 340, 116 L.Ed.2d 280 (1991).

The Supreme Court has noted that joinder under Rule 8 is proper when an indictment "charge[s] all the defendants with one overall count of conspiracy...." *United*

---

1. The jury found Fields not guilty of one count of using a firearm during a drug trafficking offense.

2. Under the Rule, "Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count."

3. The Rule provides in relevant part: "If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separated trials of counts, grant a severance of defendants or provide whatever other relief justice requires."

*States v. Lane,* 474 U.S. 438, 447, 106 S.Ct. 725, 731, 88 L.Ed.2d 814 (1986); *see also Eufrasio,* 935 F.2d at 567 ("As long as the crimes charged are allegedly a single series of acts or transactions, separate trials are not required."). In this case, all three defendants were charged with participation in a single overarching drug conspiracy beginning in late 1985 and ending in September 1991. That is sufficient for joining these defendants in a single trial. *See Eufrasio,* 935 F.2d at 567. Moreover, the indictment alleged as overt acts in furtherance of the conspiracy the substantive acts with which these defendants were charged, further demonstrating the efficiency of a joint trial.

■ Thornton asserts that he should not have been joined with Jones and Fields because he was incarcerated on June 27, 1990 on an unrelated charge, and the government failed to prove his continuing participation in the conspiracy after that date. Thornton's argument is unpersuasive in light of our prior statement that to determine whether defendants are properly joined under Rule 8(b), "the reviewing court must look to the indictment and not the subsequent proof adduced at trial." *United States v. McGill,* 964 F.2d 222, 241 (3d Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 664, 121 L.Ed.2d 588 (1992). The indictment in this case alleged that Thornton participated in the conspiracy through its conclusion in September 1991.

■ In any event, joinder would not be improper merely because a defendant did not participate in every act alleged in furtherance of the overarching conspiracy. *See, e.g., United States v. DeVarona,* 872 F.2d 114, 120 (5th Cir.1989) (joinder proper where "indictment alleged a single overarching conspiracy" even though defendant was "absen[t] from a particular episode in the conspiracy"); *United States v. Nerlinger,* 862 F.2d 967, 973 (2d Cir.1988) (joinder proper even though defendants' "respective acts committed in furtherance of the conspiracy occurred during chronologically distinct periods").[4]

■ Defendants' argument that they were misjoined under Rule 14 is similarly unpersuasive. As the Supreme Court recently explained, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* — U.S. —, —, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993). The district court in this case concluded that Thornton and Jones were both leaders of the JBM and that severance was inappropriate because the defendants had failed to demonstrate that joinder would be prejudicial.[5]

■ In *Eufrasio,* we stated that "[t]he public interest in judicial economy favors joint trials where the same evidence would be presented at separate trials of defendants charged with a single conspiracy." 935 F.2d at 568. *See also Zafiro,* — U.S. at —, 113 S.Ct. at 937 ("There is a preference in the federal system for joint trials of defendants who are indicted together."). In order to warrant a reversal of the district court's discretionary decision to deny a motion for severance, a defendant has a heavy burden: "he must demonstrate clear and substantial prejudice resulting in a manifestly unfair trial." *Eufrasio,* 935 F.2d at 568 (quotation and emphasis omitted).

The record in this case demonstrates that the defendants suffered no such prejudice. Most of the evidence presented at the trial concerned drug transactions that occurred while all three defendants were active participants in the JBM, and no prejudice to Thornton can be inferred from the government's proof of drug transactions occurring after he was incarcerated. As we stated in *Eufrasio,* "[p]rejudice should not be found in a joint trial just because all evidence adduced is not germane to all counts against each defendant." *Id.* Thus, we conclude that the district court did not err in denying the defendants' motions for separate trials.

---

4. Thornton's citation to *United States v. Ellis,* 709 F.2d 688 (11th Cir.1983), is inapposite because in that case there were three separate conspiracies rather than a single common one.

5. Unlike Thornton and Jones, Fields did not make a motion for severance under Rule 14 before the district court. Thus, he has waived the right to present that issue on appeal.

## B.

Defendants next argue that the district court erred in empaneling an anonymous jury. We review the district court's ruling for abuse of discretion and must be "particularly deferential" to the district court's "substantial discretion" to empanel an anonymous jury. *United States v. Scarfo*, 850 F.2d 1015, 1023 (3d Cir.), *cert. denied*, 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988); *see also Eufrasio*, 935 F.2d at 574.

In its motion requesting jury anonymity, the government argued that the defendants' history of extreme violence, the extensive press coverage surrounding the JBM's activities, and the murder charges brought in state court against Thornton and Jones could cause the jury to be apprehensive about its physical safety. The government also asserted that members of the JBM had intimidated witnesses on four prior occasions. In granting the motion, the district court stated that "[i]n light of the news media coverage of persons and events purportedly associated with the so-called 'Junior Black Mafia,' ... the court finds that sufficient potential for juror apprehension for their own safety exists to justify use of an anonymous jury to ease such tensions." App. at 82.

Defendants do not claim that the empaneling of an anonymous jury limited their ability to conduct voir dire. Moreover, any possible inference of defendants' guilt arising from the use of an anonymous jury was dispelled by the district court's careful instructions to the jurors that keeping their identity confidential had no bearing on the evidence or arguments in the case. We find no abuse of discretion by the district court.

## C.

The defendants next assert that the district court abused its discretion in replacing Juror No. 3 and declining to remove Juror No. 12 during the trial. *See United States v. Cameron*, 464 F.2d 333, 335 (3d Cir.1972) (trial judge has "sound discretion" to remove juror).

On Day 13 of the trial, the government informed the court that a United States Marshal had observed "visual communication" between Juror No. 3 and defendant Fields consisting of smiles, nods of assent, and other non-verbal interaction. The court declined the government's request to question Juror No. 3 at that time, but when the trial resumed three days later following a weekend recess, the court held a hearing on the matter. After questioning the juror and the Marshal who witnessed the communication, the district court concluded:

> I believe the Marshal. I've observed him sitting here day in and day out.... [He saw] Juror No. 3 and Mr. Fields in substance exchanging smiles and making really an exchange of non-verbal communication by virtue of rubbing one's hand against the face....
>
> .        .        .        .        .
>
> [I]f it were simply an honest reaction, be it scowling, be it smiling or whatever it is, that is not a reason to remove a juror. But I think what you have here ... is a reasonable inference which I draw, that it was not just an honest reaction ... but rather an exchange of smiles that it was an exchange of non-verbal communication....
>
> Frankly, I think Juror No. 3 protested too much and I just don't believe her.

App. at 2375–76.

In response, Fields moved to strike Juror No. 12 for scowling. The district court denied the motion, stating, "I think Juror No. 12, even assuming what you proffer about the scowling, that would be different because it's not really an exchange of non-verbal communication. It's a reaction I suppose to the evidence...." App. at 2378.

Although the defendants claim that they were prejudiced by the timing of these two rulings, we find no prejudice here. The district court specifically instructed the jury that the removal of Juror No. 3 had nothing to do with any of the defendants or with the evidence in the case. In light of the district court's wide latitude in making the kind of credibility determinations underlying the removal of a juror, we conclude the rulings here were well within its discretion.

### D.

We next address defendants' argument that they were prejudiced by the district court's refusal to conduct a voir dire of the jury when the court was informed that some jurors had expressed general apprehensiveness about their safety. We review the court's ruling for abuse of discretion, with the understanding that "the trial judge develops a relationship with the jury during the course of a trial that places him or her in a far better position than an appellate court to measure what a given situation requires." *Government of the Virgin Islands v. Dowling*, 814 F.2d 134, 137 (3d Cir.1987).

On Day 4 of the trial, the district court called a side bar conference and stated to counsel:

> My Deputy Clerk advises me that some of the jurors have expressed a general feeling of apprehensiveness about their safety. I told her to contact Marshal Dennis ... [who] can make some kind of arrangements which will make them more comfortable.

App. at 742. Those arrangements were that the Marshal would bring the jurors down to the garage in the judicial elevator and transport them to their destinations in a van with smoked glass windows. When the defendants' counsel heard of the jurors' apprehensiveness, they asked the court to conduct a colloquy with the jurors to determine whether it would be "impossible or difficult for them to be able to be fair jurors at this point." App. at 743. The district court responded:

> My reaction is it's perfectly understandable why the jurors would feel apprehensive simply from listening to the testimony in the case as I have and I don't have to ask them why. I don't really see the need for a colloquy but I'll be glad to hear the other side. It seems to me a colloquy is going to make the problem worse and the best way to do it is to treat it in a low key way. I'm inclined to follow [the Marshal's] advice and not make a big deal out of it.

> .    .    .    .    .    .

> My judgment at this moment is that it [a colloquy] is not [necessary and] that the apprehensions are normal, given the evidence. . . . [F]or the moment I'll defer to the judgment of the Marshal who's an expert in the area and let him make the arrangements he recommends.

App. at 744–45. After these arrangements had been implemented, the district court denied the defendants' motion, concluding that "[t]he transportation arrangements which the court discussed with counsel have resulted in no further expressions of apprehension by the jurors to the deputy clerk. Individual voir dire is unnecessary and would be counterproductive." App. at 75.

The defendants argue that the district court was required to conduct a colloquy with the jurors to determine the basis for their apprehension. We have previously expressed a preference for individual juror colloquies "[w]here there is a *significant possibility* that a juror ... has been exposed to prejudicial *extra-record* information. . . ." *Dowling*, 814 F.2d at 137 (emphasis added). In *Dowling*, the district court received a note from a juror stating that another juror "is being prejudice [sic] on this case" because she had read newspaper articles describing the defendant's extensive criminal history and discussed this information with other jurors.

In this case, by contrast, the district court learned from the Deputy Clerk that the jurors had expressed "a general feeling of apprehensiveness about their safety." Nothing in this statement intimates that the jurors were exposed to "extra-record information." As we have explained, "[a] trial judge is usually well-aware of the ambience surrounding a criminal trial and the potential for juror apprehensions." *Eufrasio*, 935 F.2d at 574. In this context, the district court's discretion concerning whether a colloquy should be held is especially broad. *See Grooms v. Wainwright*, 610 F.2d 344, 347 (5th Cir.) ("The judge's decision whether to interrogate the jury about juror misconduct is within his sound discretion, especially when the alleged prejudice results from statements made by the jurors themselves, and not from media publicity or other outside influences."), *cert. denied*, 445 U.S. 953, 100 S.Ct. 1605, 63

L.Ed.2d 789 (1980). As one court has persuasively asserted,

> [i]n determining whether to [question jurors] ..., the court must balance the probable harm resulting from the emphasis such action would place upon the misconduct and the disruption involved in conducting a hearing against the likely extent and gravity of the prejudice generated by that misconduct. We, as an appellate tribunal, are in a poor position to evaluate these competing considerations; we have only an insentient record before us.

*United States v. Chiantese*, 582 F.2d 974, 980 (5th Cir.1978), *cert. denied*, 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979).

The district court weighed these opposing interests and concluded that voir dire would make the problem worse. Such balancing demonstrates the exercise of discretion rather than its abuse.[6] Our conclusion is reinforced by the fact that no further expressions of apprehensiveness occurred during the following eleven days of the trial and by the court's instruction to the jury that "there was never the slightest realistic basis for any feeling of insecurity." 4/21/92 Tr. at 93. Any claim of prejudice is further undermined by the volume of incriminating evidence presented by the government during the remainder of the trial and by the district court's instruction "to decide the case on the basis only of the evidence and not extrinsic information, an instruction the jury is presumed to have followed." *United States v. Gilsenan*, 949 F.2d 90, 96 (3d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2971, 119 L.Ed.2d 590 (1992).

### E.

■ Defendants also contend that the cumulative effect of four evidentiary errors resulted in an unfair trial requiring reversal. A new trial is required on this ground only when "the[ ] errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." *United States v. Hill*, 976 F.2d 132, 145 (3d Cir.1992).

■ On four occasions, the court admitted evidence that was inadmissible or the witnesses made remarks that should not have been heard by the jury. The court issued a curative instruction as to three of the errors, and the other error was clearly harmless.[7]

■ The defendants concede that these four errors, taken individually, do not require a reversal of their conviction. Rather, they

---

**6.** The defendants cite for support *United States v. McAnderson*, 914 F.2d 934 (7th Cir.1990), and *United States v. Watchmaker*, 761 F.2d 1459 (11th Cir.1985), *cert. denied*, 474 U.S. 1100, 106 S.Ct. 880, 88 L.Ed.2d 917 (1986), but we believe these cases support the government. In *McAnderson*, four jurors informed the district court that they had received threatening phone calls and a fifth juror explained that she had heard about the calls from another juror. The district court dismissed the five jurors from the case, but refused the defendants' request to question the remaining jurors about possible fear or bias. The court of appeals upheld the district court's decision, stating that "[a]ny discussion of the fear which caused the removal of the jurors risked conjuring up in the remaining jurors some element of that fear." 914 F.2d at 944.

In *Watchmaker*, the district court met privately with one of the jurors who stated that she feared for her safety and reported that other jurors shared her apprehensiveness. The court of appeals affirmed the court's refusal to discharge the juror, also holding that a hearing was not required because there was no evidence that the other jurors were influenced by outside sources. 761 F.2d at 1465–66.

**7.** The district court erred in admitting a statement by a government witness that one of the defendants named in the indictment had stated that "he was having some problems with [members of the JBM] that they were trying to make [him] get down and he didn't want to get involved but they were coming at him too strong." App. at 1683. In order for the coconspirator exception to the hearsay rule to apply, the declarant must be a member of the conspiracy at the time the statement is uttered. *See, e.g., United States v. Minicone*, 960 F.2d 1099, 1110 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 1511, 117 L.Ed.2d 648 (1992). Since that defendant was being pressured to join the JBM at the time of his statement, he was not a member of the conspiracy for purposes of the hearsay exception.

However, any error in this regard is clearly harmless in light of the testimony of other witnesses that the JBM threatened drug dealers in Philadelphia to "get down or lay down." App. at 874, 1282, 1334, 1516. *See generally United States v. Casoni*, 950 F.2d 893, 917–18 (3d Cir. 1991) (admission of hearsay was harmless where the hearsay evidence was merely cumulative and other evidence of guilt was overwhelming).

contend that the cumulative effect was sufficiently prejudicial to require a new trial. We disagree. Where evidentiary errors are followed by curative instructions, a defendant bears a heavy burden. The Supreme Court has stated that we must "presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Greer v. Miller,* 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 3109 n. 8, 97 L.Ed.2d 618 (1987) (citations and quotations omitted). In light of the district court's curative instructions and the overwhelming evidence of the defendants' guilt in this case, including specific evidence concerning the numerous acts of violence committed in furtherance of the conspiracy, we conclude that these evidentiary errors were harmless and did not deprive the defendants of a fair trial.

#### F.

■ Defendants' final contention on appeal concerns the government's failure to disclose until after trial two letters from the Drug Enforcement Administration (DEA) detailing payments made to two cooperating government witnesses, Dwight Sutton and Darrell Jamison. Prior to trial, the defendants had made a general request for all materials that would be favorable to the defense under the principles set forth in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, including information concerning arrangements with or benefits given to government witnesses. The government produced witness agreements (including immunity agreements) and information documenting payments to several cooperating witnesses. In October 1992, after the defendants had been sentenced and had filed notices of appeal, the government became aware that Jamison and

Sutton had received payments from the DEA. Shortly thereafter, it provided this information to defense counsel.

Thornton and Jones then moved for a new trial pursuant to Fed.R.Crim.P. 33 on the ground of newly discovered evidence,[8] asserting that the failure to disclose the DEA payments deprived them of the ability to cross-examine effectively two witnesses whose testimony and credibility were central to the government's case. The district court, after ascertaining that it had jurisdiction to entertain the post-trial motions, *see United States v. Cronic,* 466 U.S. 648, 667 n. 42, 104 S.Ct. 2039, 2051 n. 42, 80 L.Ed.2d 657 (1984), denied the motions on their merits. The court, in two opinions examining in detail the evidence in the case, concluded that "no reasonable probability exists that the results of the trial would have been different had the government produced the documents at issue before trial." App. at 55, S.App. at 93.

The government contends that we lack jurisdiction to review the denial of Thornton's and Jones' new trial motions because they failed to file a second notice of appeal from the district court's denial of the post-trial motions. Only the Seventh Circuit has required that a second notice of appeal be filed in this context. *See United States v. Harvey,* 959 F.2d 1371, 1377 (7th Cir.1992). Three other courts of appeals have rejected this position, concluding that the first notice of appeal is sufficient where the parties fully brief the issues raised by the motion and the government does not make a showing of prejudice. *United States v. Burns,* 668 F.2d 855, 858 (5th Cir.1982); *see also United States v. Davis,* 960 F.2d 820, 824 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 210, 121 L.Ed.2d 150 (1992); *United States v. Wilson,* 894 F.2d 1245, 1251–52 (11th Cir.), *cert. denied,* 497 U.S. 1029, 110 S.Ct. 3284, 111 L.Ed.2d 792 (1990).

■ Although this court has never expressly considered this issue, we have held,

---

8. The Rule states in relevant part: "A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case." Defendant Fields did not

file a motion for a new trial before the district court. It follows that we may not consider his claim on appeal. *See, e.g., United States v. Dansker,* 537 F.2d 40, 65 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

relying on *Burns,* that notice and prejudice are the touchstones for determining the timeliness of a premature notice of appeal in a criminal case. *See United States v. Hashagen,* 816 F.2d 899, 903–04 (3d Cir.1987) (in banc). Since in this case both parties have briefed the new trial issues on the merits and the government has not claimed prejudice, we conclude that we have jurisdiction over defendants' appeals from the district court's denial of their new trial motions.

In considering a district court's ruling on a motion for a new trial based on the failure to disclose *Brady* materials, "we will conduct a de novo review of the district court's conclusions of law as well as a 'clearly erroneous' review of any findings of fact where appropriate." *United States v. Perdomo,* 929 F.2d 967, 969 (3d Cir.1991). Where the district court applies the correct legal standard, its "weighing of the evidence merits deference from the Court of Appeals, especially given the difficulty inherent in measuring the effect of a non-disclosure on the course of a lengthy trial covering many witnesses and exhibits." *United States v. Pflaumer,* 774 F.2d 1224, 1230 (3d Cir.1985) (citation omitted), *cert. denied,* 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986).

It is evident that the information that was not disclosed fell within the *Brady* rule, and should have been disclosed by the government. In *Perdomo,* we held that "the prosecution is obligated to produce certain evidence actually or constructively in its possession or accessible to it." 929 F.2d at 970. More recently, in *United States v. Joseph,* 996 F.2d 36 (3d Cir.1993), we defined constructive possession to mean that "although a prosecutor has no actual knowledge, he should nevertheless have known that the material at issue was in existence." *Id.* at 39.

We understand the government's brief to explain that the prosecutors themselves did not know of the DEA payments to the witnesses. That is hardly an acceptable excuse. The prosecutors have an obligation to make a thorough inquiry of all enforcement agencies that had a potential connection with the witnesses. *See Perdomo,* 929 F.2d at 970–71.

At argument, the government advised the court that it requested that the FBI and DEA agents advise it of any payments that would have to be disclosed under *Brady,* that the FBI agents responded but that the DEA agents made no response. There is no indication that the prosecutors made any follow-up inquiry. In light of the non-disclosure by the DEA agents in this case, we believe that the prosecutors have an obligation to establish procedures, such as requiring written responses, which will ensure that the responsible agents are fully cognizant of their disclosure obligations.

Nonetheless, not every failure to disclose requires reversal of a conviction. The defendants do not dispute that the district court applied the correct legal principles in ruling on their new trial motions. The court properly recognized that " '[e]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (Opinion of Blackmun, J.)).

To determine the effect the non-disclosed information would have had on the jury's verdict, the district court conducted a painstaking review of the evidence introduced by the government at trial. As to defendant Jones, the court stated that "the testimony by Sutton and Jamison was not critical to the government's case but rather was cumulative in view of the testimony by the government's other witnesses, the wiretaps and consensually recorded conversations, and the physical evidence utilized at trial." App. at 49.

Specifically, the district court found, contrary to Jones' argument, that several witnesses other than Sutton testified that Jones wore a "JBM" ring and gave orders to other members of the organization, that Jamison was not the only witness who participated in a recorded conversation with Jones, and that the conversation between Jamison and Jones was incriminating on its face even without

Jamison's testimony. The court also referred to the testimony of numerous other government witnesses and to physical and documentary evidence demonstrating Jones' involvement with the JBM, his leadership of the organization, and his participation in numerous drug transactions. Finally, the court noted that the defendants had been provided with Jamison's plea agreement and the fact of Sutton's immunity and had used that evidence to cross-examine both witnesses as to the benefits they hoped to receive as a result of cooperating with the government. App. at 50–55.

In denying defendant Thornton's motion for a new trial, the district court found:

> Sutton did not provide any testimony, on either direct or cross examination, about Thornton. Jamison provided only minimal testimony regarding Thornton. He testified that he saw Thornton on one occasion ... in 1989 with co-conspirator Aaron Jones and Reginald Reaves and on another occasion at Jamison's house when Thornton had a gun in his possession. Jamison did not implicate Thornton in any specific criminal conduct. In fact, Jamison did not even testify that he knew Thornton to be a member of the JBM.

S.App. at 92 (record citations omitted). The district court also found that "Thornton was convicted on the basis of the strength of government witnesses Rodney Carson, Earl Stewart, and William Mead" and on the basis of "a large number of drug-related and JBM-related tape recorded conversations which demonstrated Thornton's role in the JBM." S.App. at 92. Thus, the court concluded that there was no reasonable probability that the outcome of the trial would have been different had the DEA payments been disclosed.

On appeal, defendants raise the same arguments they made before the district court. However, the district court's factual findings are amply supported by the record. The court conducted the paradigmatic review required when the government fails to meet its *Brady* obligation. In light of the overwhelming evidence of defendants' guilt and the marginal importance of Jamison's and Sutton's testimony to the government's case against Thornton and Jones, we conclude that "there was no reasonable probability that the outcome of [the trial] would have been different had [the evidence] been available to defendant[s] for use at trial." *Hill,* 976 F.2d at 139. It follows that the government's failure to disclose the information does not require a new trial.

### III.

For the foregoing reasons, we will affirm the judgments of conviction and sentence.